815 So.2d 725 (2002)
CHAMPAIGN NATIONAL BANK, Appellant,
v.
SOS INDUSTRIES, INC., et al., Appellees.
No. 5D01-2234.
District Court of Appeal of Florida, Fifth District.
April 26, 2002.
Frederick B. Karl of Squire, Sanders & Dempsey, LLP, Tampa, Frances Floriano Goins, Jennifer L. Stainforth, and Timothy J. Jarabek of Squire, Sanders & Dempsey LLP, Cleveland, Ohio, for Appellant.
Michael J. Furbush of Gronek & Latham, LLP., Orlando, for Appellee.
SHARP, W., J.
Champaign National Bank ("Champaign") appeals from a non-final order approving a secondary Assignee's Compromise and Transfer of Causes of Action in an insolvency proceeding brought under chapter 727. The assignee, Michael E. Moecker (Moecker), received an assignment of claims from an insolvent debtor, (SOS). He then assigned his rights to a third party, Susman Godfrey, LLP (SG), who represents a limited number of SOS creditors.
Champaign's trust and loan departments promoted and sold SOS's securities to its customers. It is also a creditor of SOS, in its capacity as custodian or trustee for its retirement account customers, and for itself, for losses it sustained in extending credit to SOS. Champaign is also a potential tortfeasor for having sold or promoted SOS securities to its trust customers. We reverse because we find this secondary assignment by Moecker to a third party, SG., is not authorized by chapter 727, and it does not comport with the requirements of chapter 727.
*726 The record in this case establishes that in 1989, William Kane (Kane) proposed that he could greatly expand Lifelink, a residential monitoring device company operating in Florida, if hired to manage the company. As a result, SOS was formed as a Delaware corporation, headquartered in New Smyrna Beach, Florida. Kane expanded the company through a ponzi scheme, which masqueraded as one of America's leading and fastest growing providers of medical monitoring services.
Over a ten year period, more than sixty million dollars was defrauded from investors, involving residents of multiple states, including Florida and Ohio. The length of time the company operated and paid profits to investors (over ten years), and the fact that several key individuals sold SOS investments to friends and business associates, contributed to SOS's success. Investors often rolled over their original investment and added additional money.
SOS's obligations with its investors required it to obtain medical monitoring devices from Medicall, Inc., a medical monitoring equipment company, and put these devices into service. The contracts, often styled as secure leases of tangible equipment, provided for a lease-back of the medical devices at 15-18% interest for 48-54 months. At the termination of the lease, investors sold the medical devices back to SOS for their depreciated value.
But in reality, SOS obtained and put into service only a small fraction of the monitoring devices covered by the contracts.[1] A substantial portion of the money collected went to pay obligations on earlier lease back contracts, and a substantial portion also went to a network of participants in the operation and promotion of the scheme.
In December of 2000, SOS collapsed and defaulted on its obligations to investors. It filed insolvency proceedings under chapter 727, Florida Statutes. On December 28, 2000, SOS assigned all of its assets to Moecker to liquidate and distribute them for benefit of all SOS creditors pursuant to chapter 727. Such an assignment is authorized under chapter 727.
After filing the Moecker Assignment, Moecker and a group of creditors entered into this Assignment of Claims and Delegation of Powers of Assignee for the Benefit of Creditors. Under this assignment, Moecker transferred SOS's causes of action to a large group of SOS creditors represented by SG. SG does not, however, represent all of SOS's creditors.[2] Moecker assigned the right to sue because he concluded that it would be more prudent to join forces with the creditors than to dissipate the assets of the estate in pursuing costly litigation with no guarantee of recovery. As consideration, SG creditors agreed not to intervene in the insolvency proceedings and agreed to share any recovery with non-SG creditors, after the deduction of fees, costs and other expenses. Recovery was to be on a pro rata basis.
On March 30, 2001, Moecker filed Assignee's Notice of Compromise and Transfer of Causes of Action which notified non-SG creditors of the Second Assignment and which requested the court issue an *727 order approving it. A hearing was held on May 21, 2001. The order approving the assignment was rendered on July 2, 2001.
The issue in this case is two-fold: whether an assignee, such as Moecker, may assign the right to pursue claims of creditors pursuant to chapter 727, and whether an assignment may preference the creditor-assignee, even though recovery is to be based on a pro rata basis for all creditors.
Chapter 727 does not contain any provision which authorizes an assignee, such as Moecker, to assign to a second assignee. Section 727.108(6) permits an assignee, to "the extent necessary, employ at the expense of the estate one or more appraisers, auctioneers, accountants, attorneys, or other professional persons to assist the assignee in carrying out his or her duties under this chapter." Section 727.115 gives the lower court authority to remove or appoint a replacement assignee, but there is no language in the chapter that would authorize a secondary assignment from an assignee. Even if such a secondary assignment is possible under chapter 727, the assignment to SG fails because SG does not represent all of the class of SOS creditors and SG has assumed no fiduciary obligation to the total class of creditors.
Section 727.103(2) defines the term "assignee" for the chapter, specifically providing "which assignee shall not be a creditor... or have any interest adverse to the interest of the estate." In this case, SG is a representative of some of the creditors of SOS. We see little difference between a direct creditor as an assignee and an agent of a creditor as an assignee.
In addition, contrary to the equitable treatment of creditors required by chapter 727, the secondary assignment preferences the SG creditors over non-SG creditors. Both the Moecker Assignment and section 727.114,[3] require that all the creditors share in any recovery pro rata (except for secured creditors). Although a pro rata distribution is discussed in the second assignment, paragraph three of the second assignment contains language which provides that the SG creditors will get their share first in time. Subsection 3.C provides, in part:
Recovery to SG Clients. Of the amount remaining from the gross sum recovered in connection with the Claims after deduction of fees and expenses as provided above (the "Net Proceeds"), the SG Creditors shall receive that portion indicated by a fraction whose numerator shall be the total value of bona fide claims submitted to the Assignee for Benefit of Creditors ... by SG Creditors, and whose denominator shall be the total value of such claims so submitted by all creditors. (Emphasis added)
Paragraph 3.D. provides that the "balance of the Net Proceeds remaining after recovery *728 to the SG Clients, (emphasis added)" shall be transferred to SOS's estate.
The intent of Chapter 727 is to provide a uniform procedure for the administration of insolvent estates, to ensure full reporting to creditors, and equal distribution of assets according to the priorities established under the chapter. § 721.101. The Second Assignment does not adequately accomplish these goals.
REVERSED.
PETERSON and GRIFFIN, JJ., concur.
NOTES
[1] For example, in 2000, SOS owned and monitored about 15,000 devices, approximately the same number it had for many years. However, it collected over $22 million in 2000 from the contracts which was enough to purchase nearly 99,000 devices at the price specified in the instruments.
[2] We note that in this case, Champaign is not only a creditor of SOS, but a potential debtor to the estate. In fact, SG filed a lawsuit which asserted claims against Champaign in this matter of June 28, 2001.
[3] Section 727.114 sets forth priority of claims and provides that, save for subsection (1) involving creditors with perfected liens, claims shall be distributed in the following order of priority on a pro rata basis: (1) Creditors with liens on assets of the estate which liens are duly perfected; (2) Expenses incurred during the administration of the estate, other than those expenses allowed under subsection (1), including allowed fees and reimbursements of all expenses of the assignee and professional persons employed by the assignee pursuant to s. 727.108(6); (3) Unsecured claims of governmental units for taxes which accrued prior to the filing date; (4) Claims for wages, salaries, or commissions; (5) Allowed unsecured claims, to the extent of $900 for each individual, arising from the deposit with the assignor before the filing date of money in connection with the purchase, lease, or rental of property or the purchase for services for personal, family, or household use by such individuals that were not delivered or provided; and (6) Unsecured claims.